**ORIGINAL**

# JUDGE KARAS

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CIVIL ACTION NO.

| | |
|---|---|
| BIOFUELS<br>OPERATING COMPANY, LLC,    ) | **07 CIV 8712** |
|                    ) | |

BIOFUELS
OPERATING COMPANY, LLC,  )

      Plaintiff,  )

      v.  )           **COMPLAINT**

PARSONS & WHITTEMORE  )
ENTERPRISES CORPORATION,  )

      Defendant.  )

## INTRODUCTION

1.     This action seeks a declaratory judgment that plaintiff is not interfering with defendant's rights, if any, regarding the financing and operation of plants for the manufacture of synthetic fuels.

## PARTIES

2.     Plaintiff BioFuels Operating Company, LLC ("BioFuels") is an Alabama limited liability corporation with a principal place of business in Menlo Park, California.

3.     Defendant Parsons & Whittemore Enterprises Corporation ("P&W") is, upon information and belief, a Delaware corporation with a principal place of business in Rye Brook, New York.

## JURISDICTION AND VENUE

4.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the matter in controversy exceeds the value of $75,000, exclusive of interest and costs.

5.     Venue is proper in this Court because P&W has a principal place of business within this District.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

## BACKGROUND FACTS

6.     Over the past 12 years, Dr. Jack Boykin, the principal of a company formerly known as Forest Energy Services, LLC and now known as Cello Energy, LLC (collectively, "Cello"), has developed proprietary technology – consisting of both chemical processes and mechanical designs – to produce synthetic fuels from various raw materials, including tires, plastics, agricultural residues and other cellulose-containing materials, for use in diesel engines, gasoline type internal combustion engines and jet turbine-type combustion engines (the "Technology").

7.     The Technology has the potential to revolutionize the American economy by replacing traditional petroleum-based fuels with synthetic fuels manufactured from waste materials that currently are disposed in landfills, incinerated, or only partially recycled.

8.     Cello has developed plans for the construction of manufacturing plants which would utilize the Technology to produce synthetic fuels (the "Plants").

9.     On or about April 19, 2007, Cello (while still known as Forest Energy Services, LLC ("Forest")) executed a Letter of Understanding and Option Agreement with P&W, copies of which are attached as Exhibits A and B, respectively (collectively, the "Option"). The Option superseded all prior agreements involving Cello and P&W.

10.     Pursuant to the Option, P&W paid Cello $2.5 million toward the expected $12.5 million cost of constructing an initial Plant in Bay Minette, Alabama. In turn, P&W received an option to later acquire one third of the stock of Cello – after completion of the initial Plant – upon the payment of an additional $10 million to Cello. P&W also agreed to provide engineering and construction services for, and furnish raw materials to, the initial Plant on a cost-plus basis. Finally, the Option afforded "minority shareholder" protection rights to P&W, including a prohibition on the sale of additional stock in Cello without the prior approval of P&W.

11.     Upon information and belief, at the time and after the Option Agreement was executed, both Cello and P&W recognized that Cello would have to raise an additional $10 million to construct the initial Plant, and that this amount would have to be obtained from sources other than P&W.

- 2 -

12.    BioFuels and its affiliates actively support and participate in the financing, development and operation of alternative energy sources, including but not limited to biofuel and synthetic fuel manufacturing plants.  In mid-2007, Cello approached an affiliate of BioFuels about providing financing for the Plants, and BioFuels' affiliates expressed interest.

13.    In response to that expression of interest, Cello initially proposed to P&W that BioFuels become an equity participant in the development of several Plants.  When requested by Cello, P&W refused to permit BioFuels to become an equity participant, notwithstanding the need for financing for the Plants and the significant resources that BioFuels was prepared to make available.

14.    Upon learning of P&W's rejection, Cello then negotiated a contract with BioFuels which would enable Cello and/or its affiliates to obtain sufficient funding to proceed with construction and operation of its Plants without making BioFuels an equity participant in Cello.

15.    On or about September 12, 2007, Cello (still known then as Forest) and BioFuels executed a Manufacturing and Financing Contract ("Manufacturing Contract").  A copy of the Manufacturing Contract is attached as Exhibit C.  The Manufacturing Contract provides, in relevant part that:

- BioFuels would provide $12.5 million in development fees to fund construction of the initial Plant, and an additional $12.5 million in development fees to fund the construction of two subsequent plants;

- the payments made by BioFuels would be non-recourse to Cello and its affiliates;

- Cello or its affiliates would own the Plants;

- Cello or its affiliates would handle the sale of all of the Plants' output, with assistance from BioFuels or its affiliates;

- BioFuels would operate and manage the Plants on behalf of Cello or its affiliates;

- after payment of certain fixed and other expenses, BioFuels would receive a portion of adjusted gross revenues generated from the operations of the Plants; and

- BioFuels would receive neither any equity interest in the Plants nor any ownership right to or interest in the Technology.

- 3 -

16.    The Manufacturing Contract specifically provides that it is not intended to conflict with the rights of P&W under the Option Agreement.  The Manufacturing Contract further provides:

> In the event that it is determined that there is such a conflict, then the [P&W] Option shall govern, and the parties to this [Manufacturing] Contract will renegotiate the term, provision, agreement or condition that is in conflict so as to achieve as nearly as possible the purpose and intent of this [Manufacturing] Contract.

17.    At the time of closing on the Manufacturing Contract, BioFuels paid Cello a $12.5 million project development fee.

18.    Cello is using the project development fee to design, plan and construct its initial Plant in Bay Minette, Alabama.

19.    On or about September 26, 2007, P&W, through its counsel, sent a letter to BioFuels threatening legal action and asserting that BioFuels has interfered with P&W's contractual relations with Cello.  On or about October 9, 2007, BioFuels responded by letter denying these assertions.  Copies of these letters are attached on Exhibits D and E, respectively.

20.    BioFuels does not believe that the Manufacturing Contract interferes with the rights of P&W pursuant to the Option because, among other reasons, BioFuels has no ownership interest in Cello, the Plants, or the Technology.

21.    BioFuels is prepared to finance the construction of additional Plants to utilize the Technology.  However, BioFuels is concerned about proceeding with further expenditure of funds and development of the Technology with the P&W threats outstanding.

22.    In addition to the rights of BioFuels which are being jeopardized by P&W, there is a substantial public interest involved in this matter, as the successful development of synthetic fuels at the Plants has the potential to reduce significantly the country's reliance on imported oil.

23.    An actual controversy exists between BioFuels, on the one hand, and P&W, on the other hand, as to whether the Manufacturing Contract interferes with P&W's rights pursuant to the Option.

- 4 -

24.    BioFuels seeks a declaratory judgment as to the rights and obligations of the parties. In particular, BioFuels seeks a declaration that BioFuels is not interfering with P&W's rights, if any, pursuant to the Option.

WHEREFORE, BioFuels requests that the Court:

1.    Enter judgment in its favor.

2.    Issue a declaratory judgment in favor of BioFuels, that BioFuels is not interfering with P&W's rights pursuant to the Option.

3.    Award costs and attorneys fees to BioFuels.

4.    Grant such other relief as the Court deems just and proper.


Respectfully submitted,

BIOFUELS OPERATING COMPANY, LLC,

By its attorneys,

_____

David W. Bowker (DB-3029)
David M. Burkoff (DB-9258)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

*Of counsel:*

Richard A. Johnston
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Dated: October 9, 2007

US1DOCS 6388930v3

# Exhibit A

*Parsons & Whittemore* ENTERPRISES CORPORATION 

4 INTERNATIONAL DRIVE · RYE BROOK, NEW YORK 10573

TELEPHONE (914) 937-9009
TELECOPIER (914) 937-2259

GEORGE F. LANDEGGER
CHAIRMAN

April 19, 2007

Dr. Jack W. Boykin
Director
Forest Energy Systems, LLC
P.O. Box 426
Montrose, AL 36559

Gentlemen:

This letter agreement confirms our mutual understanding of the business relationship among our companies going forward.

1.  The Boykin Family Trust (the "Trust") and its wholly owned subsidiary Forest Energy Systems LLC, an Alabama LLC ("FES") (the Trust and FES hereinafter referred to as "FES") in consideration of the payment set forth in the Option Agreement of even date herewith grant Parsons & Whittemore Enterprises Corp., any of its subsidiaries, affiliates and/or any entity the majority of which is owned or controlled by George F. Landegger (all of which hereinafter referred to as "Parsons & Whittemore") the opportunity to become partners [on the terms set forth herein] in current and future efforts by FES and any of its subsidiaries and affiliates to pursue the production of fuels from various raw materials including, but not limited to, tires, plastics, agricultural residues, cellulose-containing materials, etc., through methods referred to hereafter as the "FES Technology", including any derivatives or enhancements thereof.

2.  After fulfillment of the condition precedent in paragraph 4, in return for the payment of $2.5 million to FES, receipt of which is hereby acknowledged, for use in the project plan as presented to Parsons & Whittemore by FES for construction of a fuel oil production factory to be built in Bay Minette, Alabama, FES simultaneously grants to Parsons & Whittemore pursuant to the Option Agreement attached hereto, an Option Agreement to acquire 33.33% of the equity of FES. The complete terms and conditions of the Option Agreement are set forth in the attached Option Agreement. To the extent that the terms set forth herein conflict or are contrary to the terms and conditions set forth in the attached Option Agreement, the terms and conditions of the Option Agreement shall control. This Option Agreement will be valid for a period beginning upon execution and ending three (3) months after the refinery being engineered and built in Bay Minette, Alabama, is physically completed and has passed standard ASTM tests attached to the Option Agreement for the production of fuel oils, diesel fuel oils, and gasoline.

3.   Simultaneously with payment of the $2.5 million consideration for the Option Agreement, FES will provide total and full transparent disclosure of the entire FES Technology to Parsons & Whittemore pursuant to the nondisclosure agreement entered into by FES on February 27, 2007. Full disclosure includes, but is not limited to, detailed drawings and process descriptions, research reports and notes, trial and test results, pilot plant operating data and economic data, economic analysis, raw material and refined product market studies, third party product evaluations, and off take agreements.

4.   Fundamental to the basis of this agreement is the joint and several warranty, undertaking, and representation of FES and the Trust, that all the intellectual property in present existence or created in the future relating to the FES Technology for the production of fuels from various raw materials, including, but not limited to, tires, plastics, agricultural residues, and cellulose-containing materials, etc., has been permanently and irrevocably assigned by the inventors, and all necessary parties, to and is owned by Forest Energy Systems LLC, free and clear of all liens and claims of any nature, including, but not limited to, licenses or other assignments. Documentary evidence of such assignment and ownership by Forest Energy Systems LLC signed by an authorized representative of the owners of the technology and of the patent applicants including Mr. Jack W. Boykin in form satisfactory to Parsons & Whittemore is a condition precedent to the payment of the $2.5 million consideration for the Option Agreement.

5.   FES hereby undertakes to construct a renewable fuels production facility of approximately 20 million gallons per year production capacity at Bay Minette, AL (the "FES project"). FES undertakes to complete the FES project, start up, and produce fuels meeting the ASTM standards for fuel oils (D 396), diesel fuel oil (D 975), and automotive spark-ignition engine fuel (D 4814) [gasoline]. Mr. Jack W. Boykin agrees to remain Chairman and Chief Executive Officer of FES to assist in the Company's achievement of successful startup, its subsequent operations and the future expansion of FES. FES will seek to obtain and be the beneficiary of keyman insurance on Mr. Jack W. Boykin in the amount of $10 million.

6.   Parsons & Whittemore agrees to provide engineering and construction services for the FES project at Bay Minette, Alabama on a cost-plus basis. A set fee of 10% but no overhead will be added to detailed engineering for that part of the facility for which Parsons & Whittemore is responsible, equipment procurement and contractors' fees. Parsons & Whittemore personnel will be charged at salary plus fringes plus 100%. Parsons & Whittemore agrees (1) to provide construction management for the entire FES project at Bay Minette, Alabama (2) to provide engineering management and detailed engineering for the FES project up to the input of the reactors and (3) to provide engineering management (with detailed engineering to be performed by others) for the reactor and subsequent portions of the FES Project. FES Management will have final authority on all decisions regarding the project.

7.   Parsons & Whittemore agrees to provide cellulose containing raw material from trees and woody shrubs for the FES project at Bay Minette, Alabama on a cost plus 10% basis with no overhead charged. The services of Parsons &

Whittemore personnel will be charged at salary plus fringes plus 100%.  FES will source the balance of the needed raw materials directly.

8.    In addition, Parsons & Whittemore personnel will be available to review with FES management potential sites for building additional production facilities in the U.S. and worldwide based on the Bay Minette, Alabama model.

9.    The parties hereto represent and warrant that they have the authority to execute this letter agreement.

Very truly yours,

Parsons & Whittemore Enterprises Corp.

By: _____
     George F. Landegger, Chairman

Accepted and Agreed:

Forest Energy Systems, LLC

By: _____
     Jack W. Boykin, Chairman

Boykin Family Trust

By: _____
     Jack W. Boykin

# Exhibit B

## OPTION AGREEMENT

### As of April 19, 2007

### To Purchase Shares of Common Stock of Forest Energy Systems LLC, an Alabama LLC, (the "Company")

<u>Number of Shares; Exercise Price; Term</u>.  This certifies that, in consideration of the payment of $2,500,000, Parsons & Whittemore Enterprises Corp., a company owned or controlled by it, or a company the majority of which is owned by or controlled by George F. Landegger (collectively the "Option Holder") is entitled, upon the terms and subject to the conditions hereinafter set forth, at any time after the date hereof and at or prior to three (3) months after the first commercial production and sale of fuels meeting the ASTM standards as set forth on Exhibit A for fuel oil, diesel fuel oil, and automotive spark-ignition engine fuel, whichever is later (the "Expiration Time"), but not thereafter, to acquire from the Company certain newly issued fully paid and nonassessable shares (the "Shares") of voting common stock of the Company (the "Common Stock") at an exercise price of $10,000,000 (the "Exercise Price").  Such Exercise Price reflects the basic agreement to sell 33.33% of the equity of the Company to the Option Holder for an aggregate price of $12,500,000.  Thus, if hypothetically the Company had 1,000 shares of voting Common Stock outstanding just prior to the exercise of this Option, then the Company would issue 500 new shares to the Option Holder upon exercise.  So, as a result of the exercise of this Option, the Option Holder would then own one-third (1/3) of the total outstanding voting Common Stock of the Company after exercise.  The $2,500,000 paid for this Option shall be credited as one part of such $12,500,000 aggregate price.  Thus, at the time of exercising this Option, the Option Holder shall be obliged to pay $10,000,000.  The $2,500,000 paid for this Option shall be applied by the Company to the construction costs of the facility that the Company hereby undertakes to build in Bay Minette, Alabama for the production of 20 million gallons per year of renewable fuels meeting the ASTM standards set forth on Exhibit A.  Simultaneously with the payment of the $2.5 million price for this Option, the Company will provide total and full transparent disclosure of the entire FES Technology as defined hereafter to the Option Holder and/or its affiliates pursuant to the nondisclosure agreement entered into by the Company on February 27, 2007.  Full disclosure includes, but is not limited to, detailed drawings and process descriptions, research reports and notes, trial and test results, pilot plant operating data and economic data, economic analysis, raw material and refined product market studies, third party product evaluations, and off take agreements.  Fundamental to the basis of this Option is the joint and several warranty, undertaking, and representation of Forest Energy Systems, LLC and the Boykin Family Trust ("BT"), that all the

O:\P&W\Option Agreement - FES - V5 - 04-17-07.doc

intellectual property relating to the technology for the production of fuels from various raw materials, including, but not limited to, tires, plastics, agricultural residues, cellulose-containing materials (the "FES Technology") has been assigned to and is owned by Forest Energy Systems, LLC, free and clear of all liens and claims of any nature, including, but not limited to, license or other assignment. This undertaking endures beyond the termination of this Option. Documentary evidence of such assignment and ownership in form satisfactory to the Option Holder is a condition precedent to the payment of the $2,500,000 consideration for this Option.

1.  The number of Shares and type of security are subject to adjustment as provided herein, and all references to "Shares" shall be deemed to include any such adjustment or series of adjustments.

2.  <u>Cash Exercise</u>. The purchase rights represented by this Option are exercisable by the Option Holder or its successors and assigns at any time prior to the Expiration Time, by the surrender of this Option duly completed and executed on behalf of the Option Holder, at the office of the Company in Montrose, Alabama (or such other office or agency of the Company as it may designate by notice in writing to the Option Holder at the address of the Option Holder appearing on the books of the Company), and upon payment of the Exercise Price for the Shares thereby purchased (by cash, certified or cashier's check, or wire transfer payable to the order of the Company, at the time of exercise in an amount equal to the purchase price of the Shares thereby purchased). Thereupon, the Option Holder as the holder of this Option shall be entitled to receive from the Company a stock certificate in proper form representing the number of Shares so purchased.

3.  <u>Issuance of Shares</u>. Certificates for Shares purchased hereunder shall be delivered to the Option Holder within a reasonable time after the date on which this Option shall have been exercised in accordance with the terms hereof. All Shares that may be issued upon the exercise of this Option shall, upon such exercise, be duly and validly authorized and issued, fully paid and nonassessable. The Company agrees that the Shares so issued shall be and shall for all purposes be deemed to have been issued to the Option Holder as the record owner of such Shares as of the close of business on the date on which this Option shall have been exercised or converted in accordance with the terms hereof.

4.  <u>No Fractional Shares or Scrip</u>. No fractional Shares or scrip representing fractional Shares shall be issued upon the exercise of this Option.

5.  <u>No Voting Rights as Shareholders</u>. This Option does not entitled the Option Holder as a holder hereof to any voting rights as a shareholder of the Company prior to the exercise hereof.

6.  <u>Loss, Theft, Destruction or Mutilation of Option</u>. Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Option, and in the case of loss, theft or destruction, of indemnity or

security reasonably satisfactory to it, and upon reimbursement to the Company of all reasonable expenses incidental thereto, and upon surrender and cancellation of this Option, if mutilated, the Company will make and deliver a new Option of like tenor and dated as of such cancellation and re-issuance, in lieu of this Option.

7.   Saturdays, Sundays, Holidays, etc.   If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday or a Sunday or shall be a legal holiday, then such action may be taken or such right may be exercised on the next succeeding day not a Saturday or a Sunday or a legal holiday.

8.   Protective Covenants.   Upon the signing of this Option, the Option Holder will have the potential to become a minority shareholder of the Company.   It is mutually understood that a minority shareholder is inherently in a vulnerable position.   Thus it is agreed by the Company, BT and their Boards of Directors that upon the signing of this Option, that certain customary minority shareholder protections will become effective and the Option Holder shall immediately have all the rights of the Minority Shareholder (the "Minority Shareholder") as used in this paragraph. Specifically, the Common Stock of the Company may not be sold, pledged, or otherwise transferred.   Additional Common Stock of the Company, except for the Shares issued through the exercise of this Option shall not be issued.   Common Stock of the Company shall not be redeemed.   Furthermore, prior written approval of the Minority Shareholder shall be required for merger, consolidation, or dissolution; subdivision, combination or reclassification of shares; recapitalization; sale or licensing of most of the Company's assets; sale, licensing, assignment or other transfer of all or any part of the FES Technology; bankruptcy filing, pension creation, contribution to individual pensions in excess of 5% of the individual's annual salary, bonus payments in excess of 25% of the individual's annual salary, substantial compensation increases, loans to shareholders or employees, major capital expenditures of the Company other than those proposed in the project plan; and related party transactions in excess of $100,000. In addition, the Minority Shareholder shall be entitled to select four (4) of the twelve (12) members of the Board of Directors of the Company.   This requirement for Minority Shareholder approval shall endure after the exercise of this Option as if made a part of the articles and by-laws of the Company, which shall not be amended without Minority Shareholder approval. The Company, BT and their Boards of Directors agree to reflect these Minority Shareholder protections in an Operating Agreement for FES promptly upon the exercise of this Option.

9.   Governing Law.   This Option shall be binding upon any successors or assigns of the Company.   This Option shall constitute a contract under the laws of Alabama and for all purposes shall be construed in accordance with and governed by the laws of said State, without giving effect to the conflict of laws principles of Alabama.

10.   Attorneys' Fees.  In any litigation, arbitration or court proceeding between the Company and the Option Holder, the prevailing party shall be entitled to reasonable attorneys' fees and expenses incurred in enforcing this Option.

11.   Amendments.  This Option may be amended and the observance of any term of this Option may be waived only with the written consent of the Company and the Option Holder.

12.   Notice.  All notices hereunder shall be in writing and shall be effective (a) on the day on which delivered if delivered personally or transmitted by telex or telegram or telecopier with evidence of receipt, (b) one business day after the date on which the same is delivered to a nationally recognized overnight courier service with evidence of receipt, or (c) five business days after the date on which the same is deposited, postage prepaid, in the U.S. mail, sent by certified or registered mail, return receipt requested, and addressed to the party to be notified at the address indicated below for the Company, or at the address for the Option Holder as the holder set forth in the registry maintained by the Company or at such other address and/or telecopy or telex number and/or to the attention of such other person as the Company or the Option Holder may designate by ten-day advance written notice.

13.   Entire Agreement.  This Option contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous arrangements or undertakings with respect thereto.

14.   Transfer.  This Option and the rights granted hereby are transferable by the Option Holder or any successors or assigns.

   **IN WITNESS WHEREOF,** the Company has caused this Option to be executed by its duly authorized officer.

Forest Energy Systems, LLC

By: _____
   Jack W. Boykin, Chairman

Boykin Family Trust

By: _____
   Jack W. Boykin

Parsons & Whittemore Enterprises Corp.

By: _____
   George F. Landegger, Chairman

O:\P&W\Option Agreement - FES - V5 - 04-17-07.doc                                        4

# EXHIBIT A

ASTM D 4814, Standard Specification for Automotive Spark-Ignition Engine Fuel [gasoline]

ASTM D 975, Standard Specification for Diesel Fuel Oils

ASTM D 396, Standard Specification for Fuel Oils

# Exhibit C

# Manufacturing and Financing Contract

This Manufacturing and Financing Contract ("Contract") for the financing and operation of plants for the manufacture of synthetic fuels is made and entered into this ___ day of September, 2007, (the "Effective Date") by and between Forest Energy Systems, LLC ("FES") and BioFuels Operating Company, LLC ("BioFuels").

## I.    The Parties

1.    FES is a limited liability company organized and existing under the laws of the State of Alabama.

2.    FES or its affiliates desire to have constructed and to have operated Plants for production of Synthetic Fuels using FES Technology.

3.    BioFuels is a limited liability company organized and existing under the laws of the State of Alabama.

4.    BioFuels or its affiliates have access to financial resources adequate to carry out the terms provisions and requirements of this Contract, including making commercially reasonable efforts to arrange financing for construction of Plants using the FES Technology pursuant to the terms of this Contract.

## II.    Definitions

For the purposes of this Contract, the following terms have the following meanings:

"Feedstock" means raw materials, chemicals and other materials, which are used as feed in a Plant, including but not limited to tires, plastics, agricultural products and residues, and cellulose-containing materials.

"FES Patent Rights" means past, present and future patents and patent applications in any country, which patents and patent applications are owned or controlled by FES, in which the claims of such patents or patent applications cover subject matter within the FES Technology.

"FES Proprietary Information" means information and know-how developed or acquired by, or for the benefit of, FES relating to FES Technology, which will be made available to BioFuels, its affiliates, or a third party in connection with this Contract or the O&M Agreement, which is subject to Intellectual Property Rights owned, controlled, or acquired by FES.

"FES Technology" means technology developed or acquired by FES for the production of Synthetic Fuel by conversion of a Feedstock. FES Technology includes FES Proprietary Information and FES Patent Rights made available in accordance with this Contract. FES Technology also shall include any improvements or modifications that may be developed, acquired, realized or implemented hereafter, pursuant to this Contract.

"Gross Revenue" means payments and other compensation received from sale or other disposition of Output from a Plant.

"Intellectual Property Rights" means patents, patent applications, copyrights (whether registered or unregistered), trade secrets, know-how, and other intellectual property rights (other than trademarks and similar rights), whether protected, created, or arising under the laws of the United States or any other jurisdiction, including, but not limited to, any of the foregoing with respect to inventions, discoveries, methods, processes, compositions, or writings.

"O&M Agreement" means an Operating and Maintenance Agreement entered into between the parties or their respective affiliates in accordance with this Contract.

"Output" means Synthetic Fuel, metallic and non-metallic by-products, electric power, and any other product produced or generated in connection with the operation of a Plant, each of which is capable of use or sale, together with renewable energy certificates, green energy certificates, emission credits, emission offsets, and the like received in connection with a Project.

"Plant" means any facility engineered, constructed, or operated based on or using the FES Technology for the production of Synthetic Fuels, by-products, or electric power.

-2-

"Project" means the construction and operation of a Plant in accordance with this Contract, together with financing, engineering, permitting, and other associated activities.

"Project Debt" means debt incurred by FES or its affiliates through Lenders arranged by BioFuels or its affiliates to provide adequate funds to engineer, obtain governmental permits, construct, start-up, and initially operate a Project before sufficient Gross Revenue is expected to be generated to fund continued operation of the Project.

"Synthetic Fuel" means primarily hydrocarbon-based materials, which may contain oxygenated hydrocarbons, useful as fuel, which are derived from sources other than by direct conversion of crude petroleum or natural gas.

### III.    Use of FES Technology

1.     FES will make available to BioFuels and to BioFuel's Operating Company affiliates all FES Technology necessary and appropriate for the operation, and maintenance of the Plants constructed in accordance with this Contract and each O&M Agreement; provided, however, that FES Technology and FES Proprietary Information shall at all times remain sole property of FES during and after the term of the Contract and each O&M Agreement.

2.     Any additional Intellectual Property Rights, which are created or developed during the course of performance of this Contract or an O&M Agreement and which relate to the FES Technology is and shall become the sole property of FES. All inventions and discoveries made by BioFuels or an Operating Company, or by any of their respective officers, employees or agents, in connection with activities undertaken pursuant to this Contract or an O&M Agreement shall be promptly and fully made known to FES. BioFuels agrees to assign or cause to be assigned, and hereby assigns, all Intellectual Property Rights to such inventions and discoveries to FES, and agrees that any such officers, employees or agents will execute any necessary documentation, including but not limited to assignments, consents, affidavits, applications for Letters Patent in the United States of America and countries foreign thereto, and any papers that may be needed to perfect ownership of such Intellectual Property by FES. BioFuels agrees to create, and at all times maintain, contractual obligations and adequate procedures with its affiliates (including each Operating Company), and its and their

-3-

respective officers, agents and employees that will enable BioFuels to carry out the terms of this paragraph. For the avoidance of doubt, the parties acknowledge and agree that affiliates of BioFuels are or may be involved in the design, engineering, construction, financing, operation or management of biofuels production facilities using third-party technology, that any Intellectual Property Rights that are developed or becomes known to any such affiliate in connection with those activities shall not be subject to the provisions of this paragraph, and that prior to using any knowledge, processes, or products subject to such Intellectual Property Rights in connection with its performance under this Contract or an O&M Agreement BioFuels will (a) disclose the existence of any such Intellectual Property Rights to FES, and (b) use such Intellectual Property Rights only pursuant to a license or other form of appropriate agreement.

3.      All literary, artistic or other material (including but not limited to reports, computer programs, manuals, or photographs) created by BioFuels or its affiliates and their respective officers, employees, and agents solely in connection with performance of the Contract or an O&M Agreement are deemed works made for hire and shall belong exclusively to FES, with FES having the right to obtain and hold in its own name such copyrights. To the extent that any of said literary, artistic or other material may not, by operation of law, be works made for hire, BioFuels shall, upon a request by FES, assign to FES ownership of copyright in such material.

## IV.    The Projects

1.      The parties agree that pursuant to this Contract a minimum of three (3) Plants will be designed, engineered, constructed, operated, and maintained. Each Plant will constitute a separate Project. The parties acknowledge that FES including its affiliates is responsible for the design, engineering, and construction activities in a Project and BioFuels including its respective affiliates is responsible for financing, operation, and maintenance activities in each Project.

A.  BioFuels agrees to pay to FES a project fee of $25 million to be used for the design, engineering, permitting, financing and construction of the first three Projects (the "Project Development Fee"). The Project Development Fee shall be paid in three installments. The first installment, in the amount of $12.5 million, shall be paid in full as of the Effective Date of this Contract, and shall be used by FES or its affiliates solely for the

-4-

design, engineering, permitting, and construction of the first Project. The second installment in the amount of $6.25 million shall be paid in full at such time as FES commences the design and engineering for the second Project, and shall be used by FES or its affiliates solely as equity in connection with the financing of the second Project. The third installment in the amount of $6.25 million shall be paid in full at such time as FES commences the design and engineering for the third Project, and shall be used by FES or its affiliates solely as equity in connection with the financing of the third Project.

B.    The first Project shall be constructed in accordance with the standards set forth in Exhibit A. All subsequent Projects pursued under this Contract shall be constructed in accordance with the standards set forth in Exhibit A, unless the parties specifically agree otherwise. The parties acknowledge and agree that the first, second, and third Projects are process demonstration plants, and that adjustments and/or modifications to the existing and subsequent Plants may be required to meet the requirements set forth in Exhibit A (which may be modified by mutual agreement of the parties). Thereafter, the parties agree that the commencement of design for the fourth and any subsequent Project (each such Project, an "Additional Project") shall occur only when the parties confirm that all prior Projects meet or exceed the standards set forth in Exhibit A ( the "Acceptance Criteria"), unless otherwise mutually agreed.

C.    In consideration of its payment of the Project Development Fee, BioFuels shall have the right, pursuant to the terms of this Contract and each O&M Agreement, to operate, maintain and manage any Plants that are designed, constructed or operated within twenty (20) years of the Effective Date of this Contract (such right, the "O&M Right"), subject to Par. IX.4. of this Contract.

D.    Upon expiration of the O&M Right, the parties agree to evaluate and seek to reach an agreement in good faith as to whether this Contract should be amended with respect to the construction and operation of any future Plants.

E.    FES will site, permit, design, engineer and construct each Plant, using and incorporating FES Technology and FES Proprietary Information in accordance with the standards set forth in Exhibit A. The first Plant shall be constructed on a 20 acre site owned by FES in Bay Minette, Alabama.

-5-

FES' siting, permitting, design, engineering and construction of each Plant shall be performed in cooperation and coordination with BioFuels or its affiliates; provided, however, that the final decision on these matters shall be in the reasonable discretion of FES.

F.    (i) Without liability on the part of FES, and as further specified in the O&M Agreement, BioFuels or its affiliates shall use commercially reasonable efforts to arrange, directly, through an affiliate, or otherwise through other non-affiliated third party lenders (collectively, "Lenders,"), and make available to FES any and all financing necessary for the acquisition of equipment and the construction, testing, and start-up of operations of each Project.  In connection with such financing, (a) FES or its affiliates shall contribute capital (as equity) into a Project in the amount set forth in Exhibit B (the "Project Company Capital"), and (b) BioFuels or its affiliates shall endeavor to obtain from Lenders traditional Project Debt financing, in the amount and at the interest rate range set forth in Exhibit B.

(ii) In order to arrange such financing, each Operating Company (as such term is defined below) may grant a security interest in its rights under an O&M Agreement to the Lender(s), as further specified in the O&M Agreement.  In the event that the Lender(s) exercise its rights pursuant to any security agreement granting such security interest, the Lender(s) shall be entitled to exercise only such rights as are granted to the Operating Company pursuant to the O&M Agreement, which rights shall not include any rights in the FES Technology, FES Proprietary Information, or FES Patent Rights.  Payment of the Project Debt shall eliminate any interest of the Lender(s) in the Project.

(iii) The loans for a particular Project may be secured by the physical assets of that Project, but there shall be no cross-collateralization of Projects.  FES agrees that the Lender(s) may have a security interest in the specific Project for which Project Debt is obtained, and agrees that this security interest may consist of typical mortgages and security interests on the entire Project; provided, however, that the security interest shall not include any right or interest in the FES Technology, FES Proprietary Information, or FES Patent Rights.

(iv)  FES agrees to execute all documents required to carry out the purpose and intent of this Contract that may be requested by the

-6-

Lender(s), to the extent such documents are consistent with such purpose and intent.

(v)  Except by mutual agreement of the parties, no financing for a Project may require a guarantee or endorsement of the Project Debt by FES, BioFuels, or any of each of their respective affiliates, or by the individual or corporate owners of FES or BioFuels, that extends beyond the granting of a security interest in the physical assets of that Project or the O&M Agreement.

(vi)  The documentation of any security interest in any Project assets and contract rights shall include the right (but without obligation) of FES to pay off the Project Debt and receive a full cancellation and release of any security interest and/or assignment of contract rights.

## V.    Operating and Management Agreement

1.    FES may for each Project form a different single purpose entity ("Project Company") in the form of a limited liability company in the State in which a specific Project is located.  Each Project Company will be a wholly-owned subsidiary of FES.  If FES does not form such a single purpose entity for a Project, FES will be considered the Project Company for such Project.

2.    Project Company shall own each Plant and all assets that are part of each Project, shall own or lease the property on which the Plant located, and shall insure and pay all applicable taxes imposed by any local and state authority on the the property and the physical assets of such Plant.

3.    BioFuels shall for each Project form a different single purpose entity ("Operating Company") in the form of a limited liability company in the State in which the specific Project is located.  Each Operating Company shall be a wholly-owned subsidiary of BioFuels.

4.    Project Company and Operating Company shall enter into a separate O&M Agreement for each Project, identical in form and content as contained in Exhibit C hereto, except as may be modified to reflect any Project-specific terms or provisions set forth in this Contract.  Project Company and Operating Company shall at all times be considered to be independent contracting parties, and nothing in this Contract or any O&M

-7-

Agreement shall be deemed to create a partnership or joint venture between Project Company and Operating Company, or any of their affiliates. Pursuant to the O&M Agreement, Operating Company shall (i) purchase all Feedstock for the Project, and (ii) operate, maintain, and manage the Project in accordance with recognized industry standards and governmental laws and regulations for efficiency, safety and environmental protection.

5.    Operating Company shall, upon substantial completion of each Plant (the date of which shall be confirmed in writing between Project Company and Operating Company), operate and manage the Plant on behalf of and for the benefit of Project Company.  In connection with the above, Project Company shall provide Operating Company with all access that is reasonably necessary or appropriate for the performance of its rights and duties under the O&M Agreement including all operating instructions and training.

6.    FES shall provide Project Company and Operating Company with the FES Technology and FES Proprietary Information necessary or appropriate to allow Project Company and Operating Company to each perform its respective obligations under the O&M Agreement.  This Contract and the O&M Agreement do not in any way assign, license or grant any rights to Project Company or Operating Company in the FES Technology or the FES Proprietary Information.  Operating Company shall use the FES Proprietary Information solely for the purpose of operating and managing the Project, shall endeavor by all reasonable means to protect and maintain the FES Patent Rights and FES Proprietary Information, and shall not represent or state to anyone that it has acquired any interest in the FES Patent Rights, FES Proprietary Information, or FES Technology by virtue of the O&M Agreement.

7.    Operating Company shall have the right, acting in cooperation with and on behalf of Project Company, during the course of an O&M Agreement, to install additions, improvements or modifications to a Project constructed and operated pursuant an O&M Agreement, in order to:

A.    decrease the costs of operating, and/or maintaining the Project; and/or

B.    increase the safety, reliability, output, efficiency, and profitability of the Project.

-8-

The parties shall reasonably cooperate with each other with respect the financing, design and construction of any such additions, improvements, or modifications; provided, however, that Project Company shall have ultimate right to approve or disapprove any such addition, improvement or modification which would either increase the amount of the Project Debt or require an appropriation from the Gross Revenue earned by the Project, provided further, however, that such approval may not be unreasonably conditioned, withheld or delayed.

8.    Operating Company or its affiliates shall contract for and procure all Feedstock, and electric power and other utilities, necessary for the operation of each Project. For the First Project (Bay Minette), Operating Company shall purchase all wood chips, saw dust, and brushy wood materials used as Feedstock from the Alabama River Pulp Company at a price that is equal to its actual cost plus ten percent (10%); provided, however, that if either Operating Company or Project Company reasonably determines that such price is not competitive with other sources, the parties shall cooperate in determining alternate market rate sources of Feedstock for the First Project.

9.    Project Company will handle the sale of all of the Output of a Project constructed pursuant to an O&M Agreement, with the cooperation and assistance of the respective Operating Company. The parties agree that both the quantity of and price charged for any Output that is sold from any Plant constructed pursuant to this Contract shall be determined by the applicable Project Company based on then-existing market conditions in cooperation and coordination with the applicable Operating Company with respect to production scheduling. Project Company and Operating Company will seek in good faith to sell the Output from a Plant to qualified parties in a manner that reasonably maximizes the Gross Revenue received in connection with the Project.

10.    For accounting purposes, each Project shall be operated as a separate profit center. Discrete accounting records will be maintained for each Project. The proceeds of all sales of all Output shall be paid to Project Company (except to the extent otherwise required by any Lender), and placed into a clearing account for the Project generating the sales. Project Company shall maintain books and records for the operation of the Project with the full cooperation and assistance of the Operating Company. All sales of Output will require full payment of the invoiced amount within

-9-

forty-five (45) days, without any discount for early payment, and will be limited to buyers with adequate financial status to meet the required payment terms. Project Company shall pay out from the clearing account any and all revenue received from the sale of the Output of a specific Plant each month in the following order:

> A.    payment of utility and Feedstock expenses incurred in connection with the operation of the Project;

> B.    payment of principal and interest on any Project Debt for the Project.

> C.    payment to Project Company of 51% of any Gross Revenue remaining after payment of the expenses listed in V.10.A and B herein, to be its sole property; and

> D.    payment to Operating Company of the remaining 49% of any Gross Revenue remaining after payment of the amounts described in V.10. A and B herein as an O&M Fee.

11.    Operating Company shall pay from the O&M Fee all normal operating expenses (including normal maintenance expenses) of the Project from the O&M Fee, with the exception of utility and Feedstock expenses (which shall be paid in accordance with V.10.A above), and capital or maintenance upgrades to the Project (which shall be paid for by Project Company and may incur additional Project Debt). Operating Company shall maintain books and records, including but not limited to accounting records, with regard to the payment of any operating expenses for each Project, and shall maintain discrete accounting records pertaining to each Project. The parties shall freely and openly share all accounting data pertaining to each Project. All such records and books of account must be retained for at least three (3) years.

12.    At the request of a party to the O&M Agreement, the other party shall permit a mutually agreeable independent accountant selected by the requesting party (mutual agreement not to be withheld unreasonably) upon reasonable prior notice, to examine at reasonable intervals and during the regular business hours all records and books of account of the audited party relating to the O&M Agreement and the applicable Project. The requesting party is responsible for the expenses of the selected accountant. The right of

-10-

each party to audit the books and records of the other party shall be limited to the clearing account and books and records pertaining to the Project.

13.    It is the intent of the parties that any Federal or State tax credits or deductions generated, and any rebate or incentive payments made by any Federal or State agency, in connection with the ownership, construction or operation of, and manufacturing and sale of Output from any Project shall be treated as Gross Revenue for such Project. Any Federal or State grants, loans or loan guarantees issued in connection with the Project shall inure to the benefit of the Project. Any such grant shall be applied to Gross Revenue for such Project; and any such loan or loan guarantees shall be applied to Project Debt. The parties agree that to the extent necessary or desirable, the provisions of this paragraph shall be implemented on a three-year "look-back basis" (through a reconciliation process performed on an annual or other basis) by a qualified accountant that is mutually selected and paid for by the parties.

## VI.    Representations, Liabilities, Responsibilities, and Insurance

1.    FES represents that, as of the Effective Date, it owns or controls FES Technology, including FES Patent Rights and FES Proprietary Information and has the unencumbered right to provide such FES Technology for operation of the Plants contemplated by this Contract. FES represents that, as of the Effective Date, it has no knowledge of a claim made by a third party with respect to Intellectual Property Rights owned or controlled by a third party, which affects use of FES Technology for the production of Output as contemplated under this Contract.

2.    BioFuels represents that BioFuels or its affiliates have or can acquire the knowledge and technical skills required for the operation of the Plants contemplated by this Contract. BioFuels further represents that BioFuels has at least twenty-five million dollars (US$25,000,000) in available capital to be used for the purposes of this Contract.

4.    Each Project Company is responsible for the design, permitting, construction, and ownership of its respective Plant and associated Project, and shall maintain or cause to be maintained sufficient comprehensive general liability, builder's risk, automobile, and workers compensation insurance to cover any loss, damage, claim, injury or other casualty of

-11-

whatsoever kind or by whomsoever caused (irrespective of negligence or fault, whether sole, concurrent, active, passive, comparative, strict, contractual or vicarious) with respect to such design, permitting, construction and ownership of the Project. Such insurance shall cover all claims (including defense of such claims and attorney's fees and expenses) made against Operating Company or its affiliates, or any of its respective officers, directors, employees, or agents, and to their respective successors and assigns, with respect to such Plant.

5.    Each Operating Company is responsible for the operation and maintenance of its respective Plant, and agrees to maintain or cause to be maintained sufficient comprehensive general liability, operator's, automobile, and workers compensation insurance to cover any loss, damage, claim, injury or other casualty of whatsoever kind or by whomsoever caused (irrespective of negligence or fault, whether sole, concurrent, active, passive, comparative, strict, contractual or vicarious) with respect to such operation or maintenance of each Project. Such insurance shall cover all claims (including defense of such claims and attorney's fees and expenses) made against Project Company or its affiliates, or any of its respective officers, directors, employees, or agents, and to their respective successors and assigns, with respect to such Plant.

6.    Each party to an O&M Agreement agrees to provide evidence of required insurance coverage to the other party, and (to the extent permitted by law) to name the other party as an 'additional insured" on each such insurance policy obtained by the party.

## VII.  Confidentiality

1.    With respect to the FES Proprietary Information, BioFuels agrees:

(a)    to treat as confidential the FES Proprietary Information that has or may hereafter be made available to it by FES, directly or indirectly;

(b)    to limit access to any FES Proprietary Information received from FES, directly or indirectly, to only those of its employees, officers, and directors, or to those employees, officers, and directors of each respective Operating Company, who

-12-

reasonably require such FES Proprietary Information for the purpose of this Contract, and who are obligated to maintain such FES Proprietary Information as confidential in the manner and to the extent provided hereunder;

(c)    not to disclose FES Proprietary Information received from FES, directly or indirectly, to any third party without the express, prior written authorization of FES; and

(d)    not to use FES Proprietary Information received from FES in any way other than for the purposes of this Contract.

2.    Nothing contained in this Contract in any way restricts or impairs a party's right to use, disclose, or otherwise deal with any information that:

(a)    at the time of disclosure is available to the public or thereafter becomes generally available to the public by any means through no act of the party receiving the disclosure;

(b)    was in its possession prior to the time of the disclosure hereunder; or

(c)    was independently made available to it as a matter of lawful right by a third party who does not have a restriction on use or disclosure.

3.    FES Proprietary Information may not be disclosed to other parties, including actual or prospective Lenders, contractors, vendors, and consultants without the prior written consent of FES, which shall not be unreasonably conditioned, withheld or delayed, and if disclosed shall only be disclosed under suitable confidentiality agreements approved by FES.

4.    The obligations of this Article continue in full force and effect notwithstanding the expiration or termination of this Contract.

### VIII. Addresses and Notices

The addresses of the parties are as follows:

FES:

Forest Energy Systems, LLC.
P.O. Box 426
Montrose, Alabama 36559

-13-

Attn:  Allen W. Boykin, President
Telephone: 251-626-7470
Facsimile:  251-626-2069

BioFuels:                         BioFuels Operating Company, LLC
                                  3000 Sand Hill Road
                                  Building Three, Suite 170
                                  Menlo Park, California 94025
                                  Attn: Doug Cameron, President
                                  Telephone: (650) 376-8511
                                  Facsimile: (650) 376-8561

Notices required or permitted to be given or submitted under this Contract
must be in writing and sent by express courier (e.g., Federal Express, DHL,
US Postal Express Mail) with signature receipt requested to the party
entitled to receive the notice or statement at its above address or at such
other address as may most recently have been notified by such party to the
other party.  Such notices alternatively may be given or made by facsimile at
the addressee's most recently-notified facsimile number with a confirmation
copy sent by express courier to the other party.  Notices are deemed given on
the date that they are actually received by the recipient as confirmed by a
signature receipt, confirmation facsimile, return e-mail, or similar
authenticable evidence.

## IX.    Term, Assignment, Termination and Severability

1.     The term of this Contract commences upon the Effective Date, and
unless extended or otherwise terminated in accordance with this Contract,
continues in full force for twenty (20) years from the Effective Date.

2.     If a party is in material breach of this Contract, the non-breaching
party may give written notice to the other specifying the particulars of such
breach.  If the breaching party has not rectified such breach within sixty (60)
days after such notice, the non-breaching party may terminate this Contract
by giving written notice thereof to the other party.

3.     This Contract shall be binding upon and shall inure to the benefit of
the parties hereto and their respective successors and assigns, any party may
assign this Contract, and this Contract shall survive any transfer or change in
the ownership of a Project; provided, however, that

-14-

USIDOCS 6355597v1

(a)    neither party may assign this Contract without the prior written consent of the other party, which consent shall not be unreasonably conditioned, withheld or delayed;

(b)    BioFuels shall provide FES with a ninety (90) day right-of-first offer in connection with any proposal by BioFuels to sell, assign, or transfer its interest in this Contract to an unrelated third party;

(c)    any permitted assignment of this Contract by FES to another party shall ensure, as a condition of such assignment, that the O&M Rights of BioFuels under this Contract will be maintained at no additional cost to BioFuels under terms and conditions no less favorable to BioFuels as those contained in this Contract and the then-existing O&M Agreements; and

(d)    any purported assignment of this Contract, except as permitted herein, is null and void.

4.    The parties acknowledge that Forest Energy has entered into a Letter of Understanding and Option Agreement (collectively, the "P&W Option"), both dated as of April 19, 2007, that provide certain rights to Parsons & Whittemore Enterprises Corp. ("P&W"). It is the intent of both parties that neither this Contract nor the O&M Agreement interfere with or otherwise conflict with the rights granted to P&W under the P&W Option. In the event that it is determined that there is such a conflict, then the P&W Option shall govern, and the parties to this Contract will renegotiate the term, provision, agreement or condition that is in conflict so as to achieve as nearly as possible the purpose and intent of this Contract.

5.    In connection with the execution of each O&M Agreement, FES and BioFuels agree that BioFuels, upon and after its formation, shall indemnify Project Company, FES, the Boykin Family Trust, its shareholders, Allen W. Boykin, and Jack W. Boykin (collectively, the "Indemnitees") from any claim by P&W alleging that the execution of the O&M Agreement constitutes a breach of the P&W Option, as further set forth in Exhibit D attached hereto (the "Indemnity").

6.    In the event that any provision contained in this Contract or the O&M Agreement is held to be invalid, illegal or unenforceable in any respect, such illegality or unenforceability shall not affect any other provision of this Contract or the O&M Agreement, which thereafter shall be construed as if such invalid, illegal or unenforceable provision had never been contained

-15-

herein; provided, however, that in lieu of such term, clause or provision that is held to be invalid, illegal or unenforceable, the parties shall add by mutual agreement as a part of this Contract or the O&M Agreement a term, clause or provision as similar in terms to such illegal, invalid or unenforceable term, clause or provision as may be possible, valid, legal and enforceable and to the extent the remaining provisions satisfy the purpose and intent of this Contract.

7.     This Contract shall be governed by and construed in accordance with the laws of the State of Alabama, excluding any choice of law rules which may direct the application of the laws of another jurisdiction. All judicial actions taken with respect to this Contract or any rights or obligations under this Contract must be brought in a State Court located in Baldwin County, Alabama, or in Federal Court located in Mobile, Alabama.

8.     If a dispute arises out of or in connection with this Contract between FES and BioFuels, such parties agree to attempt in good faith to resolve such dispute by negotiations between executives who have authority to settle the dispute in question within thirty (30) days after a notice of the dispute given by one party to the other party. Within sixty (60) days after the notice of the dispute and upon mutual agreement of FES and BioFuels, the parties may endeavor to settle the dispute by mediation administered by a mutually-agreed third party before initiating any other proceeding. Except as may be required by law, neither a party nor a mediator may disclose the existence, content, or results of any mediation hereunder without the prior written consent of both parties.

9.     This Contract may be executed in one or more counterparts, each of which will be deemed an original. Delivery of all pages of this Contract by facsimile transmission shall be effective as delivery of a manually executed counterpart.

10.     This Contract and the O&M Agreement contain the entire understanding of the parties hereto with respect to the development of Projects, and supersedes all prior understandings and proposals, whether written or oral, between the parties with respect to the Project.

11.     This Contract is not to be construed as granting or implying a grant of any license or other rights under Intellectual Property Rights owned or controlled by a party except as, and to the extent, expressly granted herein

-16-

12.    This Contract may be amended or modified only by a written instrument, of equal formality signed by the duly authorized representatives of the respective parties.

13.    The headings used herein to identify Articles, Paragraphs, Exhibits and Attachments are used solely for the convenience of the parties and are not intended to be used in the construction or interpretation of the provisions of this Contract.

14.    If a party to this Contract agrees to waive any breach of any provision of this Contract by another party, such waiver does not excuse at any time other breaches of the same provision or breaches of any other provisions of this Contract.

15.    BioFuels and FES at all times are independent contracting parties. None of the parties to this Contract is or will be a partner, joint venturer, agent or representative of any other party under this Contract or the O&M Agreement.  None of the parties to this Contract nor their respective affiliates have a right, power or authority to enter into any contract or incur any obligation, debt or liability on behalf of the other party or its respective affiliates, without the specific, written approval of such other party.

16.    This Contract has been made solely for the benefit of, and is binding on, the parties and their respective successors and assigns.

-17-

IN WITNESS WHEREOF, the parties have caused this Contract to be duly executed in their respective names by their duly authorized representatives as of the date and year first written above.

BioFuels Operating Company, LLC

By: _____

_____, President

Forest Energy Systems, LLC

By: _____

Allen W. Boykin, President

09/12/07

-18-

## EXHIBIT A

It is the objective of the process and the Project to produce fuels which qualify as either Gasoline, #2 Diesel, or Standard Fuel Oil.  The Projects shall produce fuels, electricity or other products from various raw materials including, but not limited to, tires, plastics, agricultural products and residues, and cellulose-containing materials.

The first Project shall be located at Bay Minette, AL, and shall be capable of producing approximately 20 million gallons of fuels per year.

The second Project and the third Project each shall be capable of producing at least 40 million gallons of fuels per year.

If a Project conforms to the standards, criteria and benchmarks set forth in the correspondence from FES to BioFuels or its affiliates, then that Project will have achieved the Acceptance Criteria.

-19-

# EXHIBIT B
## ADDITIONAL COMMERCIAL TERMS

**A.     Initial Project Development and Financing Terms**

    1.     Project cost is estimated at $12.5M.

    2.     Project Development Fee shall be the amount of $12.5M.

    3.     FES Capital (comprised of the Project Development Fee) shall be the amount of $12.5M.

    4.     Project Debt shall be in an amount to be mutually determined, with an interest rate in a commercially reasonable range, based on market conditions.

**B.     Construction of Additional Projects**

    1.     Second Project

        a.     Project cost is estimated at $25M.

        b.     Project Development Fee shall be the amount of $6.25M.

        c.     Project Capital (comprised of the Project Development Fee) shall be in an amount of $6.25M.

        d.     Project Debt shall be in an amount necessary to finance the construction of the Project, on terms to be mutually determined and with an interest rate in a commercially reasonable range, based on market conditions.

    2.     Third Project

        a.     Project cost is estimated at $25M.

        b.     Project Development Fee shall be the amount of $6.25M.

        c.     Project Capital (comprised of the Project Development Fee) shall be the amount of $6.25M.

-20-

        d.    Project Debt shall be in an amount necessary to finance the construction of the Project, on terms to be mutually determined and with an interest rate in a commercially reasonable range, based on market conditions.

    3.    <u>All Additional Projects after the Third Project</u>

        a.    Estimated Project cost will be mutually determined.

        b.    Project Debt shall be in an amount necessary to finance the construction of the Project, on terms to be mutually determined and with an interest rate in a commercially reasonable range.

        c.    Any required Project equity shall be comprised of a Project Development Fee (to be paid by BioFuels to FES, and used by FES as Project Capital) and FES Capital (to be paid by Forest Energy independent of any Project Development Fee), each of which shall be in an amount that is mutually determined; provided, however, that with respect to the sum of such respective amounts, the Project Development Fee shall comprise 49% and the FES Capital shall comprise 51% of such sum.  The Parties agree to use commercially reasonable efforts to minimize the amount of Project equity that is required in connection with the development of any Additional Project, with the initial expectation that no more than 20% of the total cost of the Project shall be comprised of equity.

-21-

## EXHIBIT C

### FORM OF O&M AGREEMENT

1.    Each Project shall be governed by a separate O&M Agreement, the sole parties to which shall be the specific Project Company and Operating Company.

2.    Each O&M Agreement shall be identical in form and content to the Contract, except as follows.

      a.    The provisions of the O&M Agreement shall be modified only to the extent necessary to reflect the specifics of and parties to each individual Project, and shall also include the following provisions.

          i.    Force Majeure.  As used in this Agreement, an "Event of Force Majeure" shall mean any act or event that prevents the affected Party from performing its obligations (other than the payment of money) under this Agreement or complying with any conditions required to be complied with under this Agreement if such act or event is beyond the reasonable control of, and does not arise out of the negligent act or omission of, the affected Party and such Party has been unable by the exercise of due diligence to overcome or mitigate the effects of such act or event.  If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of an Event of Force Majeure, that Party shall be excused from whatever performance is affected by the Event of Force Majeure to the extent so affected; provided, however, that: (a) the non-performing Party gives the other Party prompt written notice (but in any event no later than seven (7) days after the occurrence) describing the particulars of the occurrence; (b) the suspension of performance is of no greater scope and of no longer duration than is reasonably required by the Event of Force Majeure; and (c) the non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party, and to continue to perform its obligations hereunder and to correct or cure the event or condition excusing performance.

          ii.    Limitation of Liability.  Notwithstanding anything to the contrary contained in this Agreement, neither Operating Company nor Project Company shall be liable, whether in contract, in tort, or otherwise, for any special, punitive, exemplary, indirect, incidental or consequential damages whatsoever, including but not limited to, loss of profits, business

-22-

interruptions and claims of customers or other third parties, for any reason whatsoever.

   b.    The provisions of the following Paragraphs and Exhibits in the Contract shall be modified or deleted as appropriate.

      i.    Paragraph IV.1 – references to multiple Projects, the Project Development Fee, and the O&M Right.

      ii.    Paragraph V.1 and .3 – references to formation of Project Company and Operating Company.

      iii.    Paragraph VI.1 – FES' representations in the contract will be binding on the Project Company, and Project Company shall also represent that FES has made available to Project Company all FES Technology necessary or appropriate for the design, engineering, permitting, construction, operation, maintenance and management of the Project.

      iv.    Paragraph VI.2 – Operating Company will represent that it has or can acquire the knowledge and technical skills required for the operation of the Project, and has adequate funds which can be used for the purposes of the O&M Agreement.

      v.    Paragraph IX.1 – the term of the O&M Agreement shall commence on and as of its effective date and shall expire on the last day of the calendar month in which the twentieth (20th) anniversary of the commercial operation of the Project occurs.  Operating Company shall have the right to renew the O&M Agreement for four (4) five-year renewal terms each such option to be exercisable upon one (1) year's prior written notice to Project Company.

      vi.    Paragraph IX.5 – this Paragraph shall be omitted.

      vii.    Paragraph IX.7—the O&M Agreement shall be governed by the law of the State in which the Project is located.

      viii.    Exhibit A – this Exhibit will only provide details for the specific Project.

      ix.    Exhibit B – this Exhibit will only provide details for the specific Project.

-23-

x.      Exhibit C – this Exhibit will be omitted.

xi.      Exhibit D – this Exhibit will be omitted.

-24-

# EXHIBIT D

# INDEMNITY

1.    BioFuels, upon and after its formation, shall indemnify, defend and hold harmless FES, the Boykin Family Trust, its shareholders, and Allen W. Boykin, and Jack W. Boykin (collectively, the "Indemnitees") from and against any and all liability, claims, damage, loss, or expense (including reasonable attorneys' fees) resulting from any claim by Parsons & Whittemore Enterprises Corp. ("P&W") alleging that the execution of the O&M Agreement constitutes a breach of the Option Agreement (a "Claim").

2.    The Indemnitees shall provide the BioFuels with written notice of any Claim by Parsons within ten (10) days of its receipt thereof.

3.    BioFuels shall control the defense and settlement of any Claim, using the qualified counsel of its choice.

4.    Indemnitees shall, at their sole cost and expense, provide reasonable assistance to BioFuels in connection with the defense of any Claim.

5.    Indemnitees shall have the right, at its sole cost and expense, to retain separate counsel to monitor BioFuels's defense of any Claim.

6.    BioFuels shall have the right to settle any Claim without the prior approval of Indemnitees, unless such settlement would materially prejudice or adversely impact Indemnitiees, in which case Operating Company must obtain the prior approval of the Indemnitees (which approval shall not be unreasonably conditioned, withheld or delayed).

-25-

# Exhibit D

# STROOCK

By UPS

September 26, 2007

Martin H. Neidell
Direct Dial  212-806-5836
Direct Fax  212-806-7836
MNeidell@stroock.com

BioFuels Operating Company, LLC
3000 Sand Hill Road
Building Three, Suite 170
Menlo Park, CA 94025

Attention:  Doug Cameron, President

Re:  Cello Energy LLC (formerly known as Forest Energy Systems, LLC)

Gentlemen:

We are counsel to Parsons & Whittemore Enterprises Corp. ("P&W"). A draft of your proposed manufacturing and financing contract with Forest Energy Systems, LLC ("FES") has been provided to us. We are outraged by your blatant attempt to circumvent the contractual commitments that FES had made to P&W, which obligations specifically refer to building a plant in Bay Minette, Alabama. Your attempted savings clause in Section IX 4 of the contract is clearly ineffectual since the entire agreement conflicts with FES' agreements with P&W. We are particularly troubled by the fact that the draft manufacturing and financing contract does not even refer to the nondisclosure agreement effective as of February 27, 2007 among FES, Boykin Trust, LLC, P&W and its subsidiary.

Without attempting to enumerate all the violations of the P&W contractual arrangements with FES contained in your agreement, it is clear that the following provisions will be breached, resulting in irreparable damage to P&W:

1    Nondisclosure Agreement dated February 27, 2007

        (a)    Under your proposed manufacturing contract, FES is to provide to you all its technology. Section 6 of the nondisclosure agreement specifically provides that FES may not disclose (emphasis added) to third parties any of the

SSL-DOCS2 70363825v1

Page 2

information that FES is purporting to supply to you pursuant to the manufacturing contract, without the prior consent of P&W. Contrary to FES' representations contained in Section IV 1 of your draft contract, FES does not have the unencumbered right to provide the FES technology.

(b)    Section 13 of the nondisclosure agreement provides that FES will not disclose the existence of the P&W agreements or "discuss with any third party the nature of any negotiations between FES and P&W pursuant to this Agreement." The mere fact that you know of the FES-P&W contractual arrangements constitutes a breach of this agreement.

2.    April 19, 2007 Letter Agreement.

(a)    Under your proposed manufacturing contract, FES is to provide all design, engineering and construction of the project. This clearly conflicts with Section 6 of the P&W agreement since P&W is to provide all engineering and construction services for the project.

(b)    Under Section 7, P&W also is to provide specified raw materials for the project.

3.    Option Agreement

(a)    Section 8 of the Option Agreement contains minority protections available to P&W. One of these protections is that FES may not incur major capital expenditures or license, assign or otherwise transfer all or any part of its technology. Both these provisions will clearly be breached by your proposed contract.

(b)    Section 8 of the Option Agreement prohibits the issuance of any additional Common Stock of FES. The proposed contract attempts to circumvent this restriction; however, in essence, you are granted equity in FES in violation of the Option Agreement.

It is clear that you are interfering with the P&W contractual obligations with FES. Accordingly, we will hold you and your principals personally liable for any and all damages that may inure to P&W, including tortious interference with its business. We demand that you hereby cease any and all discussions and negotiations with FES. If

Page 3

P&W does not receive prompt assurances from you that you will not breach its arrangements with FES then P&W will be forced to pursue all available legal and equitable remedies.

Very truly yours,

Martin H. Neidell
MHN:fc

cc:    Dr. Jack Boykin
       Mr. George F. Landegger

SIDDOCK & SIDDOCK & LAVAN LLP • NEW YORK • LOS ANGELES • MIAMI
180 MAIDEN LANE, NEW YORK, NY 10013-4982 TEL 212-860-5495 FAX 212-567-6050 WWW.SIDDOCK.COM

Exhibit E

WILMERHALE

October 9, 2007

Mark C. Kalpin

+1 617 526 6176 (t)
+1 617 526 5000 (f)
mark.kalpin@wilmerhale.com

By E-mail and First Class Mail

Martin H. Neidell, Esq.
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982

Re: Cello Energy LLC (f/k/a Forest Energy Systems, LLC) ("Cello")

Dear Mr. Neidell:

On behalf of BioFuels Operating Company, LLC ("BioFuels"), this letter responds to yours, dated September 26, 2007, regarding the Manufacturing and Financing Contract by and between Cello and BioFuels, dated September 12, 2007 (the "Manufacturing Contract").

As an initial matter, BioFuels disagrees with the contention of Parsons & Whittemore Enterprises Corp. ("P&W") that BioFuels is interfering with the rights of P&W, if any, regarding the financing and operation of one or more synthetic fuels manufacturing plants under that certain Nondisclosure Agreement, dated as of February 27, 2007 (the "NDA"), and Option Agreement, dated as of April 19, 2007 (the "Option").

As P&W is aware, Cello proposes to construct manufacturing plants ("Plants") to produce synthetic fuels from various raw materials, including tires, plastics, agricultural residues and other cellulose containing materials, for use in diesel engines, gasoline type internal combustion engines and jet turbine type combustion engines. However, Cello lacks adequate funding to finance the construction of its initial Plants.

BioFuels and its principals are actively involved in the financing, development and operation of biofuel and synthetic fuel manufacturing plants. Under the Manufacturing Contract, BioFuels would provide non-recourse funding to Cello for use in constructing and operating three Plants, and BioFuels would then operate the Plants on behalf of Cello. BioFuels would recover its funding and operating costs for each Plant only through the payment of a percentage of the adjusted gross revenue received by Cello from any sales of the output of that Plant, and would have no ownership interest in any Plant and no equity interest in Cello. In light of the significant benefits that accrue to Cello as a result of the provision of non-recourse, attractive funding, BioFuels does not understand how P&W can contend that the Manufacturing Contract will cause irreparable damage to P&W.

Turning to the specific allegations in your letter, BioFuels denies that the Manufacturing Contract will violate either the NDA or the Option. BioFuels notes that the Manufacturing Contract does not, as P&W alleges, require Cello to "provide to [BioFuels] all of its technology." Instead, the Manufacturing Contract specifies that (a) Cello will provide to BioFuels only that technology that is necessary or appropriate to allow BioFuels to perform its obligations under the

WILMERHALE

Martin H. Neidell, Esq.
October 9, 2007
Page 2

Manufacturing Contract, (b) BioFuels will use that technology only for the purpose of operating and managing the Plant, (c) BioFuels will keep all proprietary information of Cello strictly confidential, and (d) BioFuels will have no right to, license in, or other ownership interest in the technology. In this regard, BioFuels also notes that to the extent BioFuels improves on or otherwise develops new technology that is based on Cello's proprietary information, all rights to and interest in those developments and new technology belong to Cello and not BioFuels. As such, the Manufacturing Contract does not require Cello to violate either the NDA (to the extent it remains in force) or Section 8 of the Option.

BioFuels believes that your allegations with respect to Sections 6 and 7 of the Option reflect a fundamental misunderstanding of the provisions of the Manufacturing Contract. Under the Manufacturing Contract, Cello (and not BioFuels) is responsible for constructing each Plant, and BioFuels is required (subject to a limited exception) to obtain raw material for the initial Plant from an affiliate of P&W. In light of these provisions, it is not plausible for P&W to suggest that the Manufacturing Contract contravenes the proposal of P&W to construct and provide raw material feedstock for the initial Plant. Simply put, the Manufacturing Contract is fully consistent with the Option on these issues.

Similarly, P&W's argument concerning the Option's prohibition of the major capital expenditures misinterprets both the Manufacturing Contract and the Option. Under the Option, Cello must obtain the approval of P&W for any major capital expenditures other than those proposed in the project plan. At the same time, Cello is required to obtain all necessary funding (estimated at $10 million) to construct the initial Plant. As was discussed above, Cello will not be required to make any capital expenditure for the construction of the initial Plants – instead, all required capital to construct those Plants will be provided by BioFuels. This funding will be provided on a non-recourse basis by BioFuels, and BioFuels will not acquire any ownership interest in a Plant or an equity interest in Cello. Unless P&W's intent is to prohibit Cello from constructing the Plants (which are referred to in the Option as "projects"), BioFuels does not understand how P&W can implicitly allege that this non-recourse funding constitutes a major capital expenditure by Cello that is not consistent with Cello's obligation to finance and construct the Plants.

At the time of closing on the Manufacturing Contract, BioFuels paid Cello a $12.5 million fee to be used by Cello in the development of an initial Plant in Bay Minette, Alabama. Cello currently is using this fee for this purpose. BioFuels is prepared to finance the construction of additional Plants by Cello. Given P&W's threat to "pursue all available legal and equitable remedies," however, BioFuels is concerned about proceeding with any further expenditure of funding under the Manufacturing Contract until this matter is resolved.

BioFuels and Cello undertook extensive precautions in the Manufacturing Contract to ensure that it was not inconsistent with the Option. In this regard, the Manufacturing Contract contains a

WILMERHALE

Martin H. Neidell, Esq.
October 9, 2007
Page 3

"savings clause" that provides that in the event that a conflict between the Option and the Manufacturing Contract exists, then "the P&W Option shall govern, and the parties to this Manufacturing Contract will renegotiate the term, provision, agreement or condition that is in conflict so as to achieve as nearly as possible the purpose and intent of this Manufacturing Contract."

In your letter, P&W states that this savings clause "is clearly ineffectual …." In light of that statement, the serious threats made by P&W against BioFuels, and the substantial interference to the business relationship between BioFuels and Cello that has resulted from those threats, BioFuels will take whatever actions are necessary to defend its conduct and its interests.

Please do not hesitate to contact me if you have questions or need additional information.

Best regards,

Mark C. Kalpin

cc: Doug Cameron, President
    BioFuels Operating Company, LLC